811 P.2d 1308

J. Randall STEVENSON,
Plaintiff–Appellee,

v.

LOUIS DREYFUS CORPORATION,
Defendant–Appellant.

Nos. 19,300, 19,231.

Supreme Court of New Mexico.

May 20, 1991.

Keleher & McLeod, Robert H. Clark, Albuquerque, Berryhill, Benjamin, Cage & North, Jack W. Berryhill, Denver, Colo., for defendant-appellant.

Hunt & Currier, Charles C. Currier, Roswell, for plaintiff-appellee.

OPINION

FRANCHINI, Justice.

Louis Dreyfus Corporation (Dreyfus) appeals from a Judgment upon Jury Verdict awarded to Stevenson in the amount of $104,584.50 plus interest at the rate of 15 percent per annum beginning August 3,

1988, in addition to costs and attorney fees. The judgment was based on the jury's finding that: (1) a contract existed between the parties, (2) Dreyfus breached the contract, (3) total damages suffered by Stevenson were $34,861.50, (4) Dreyfus' actions violated the New Mexico Unfair Practices Act, and (5) Dreyfus' violation of the Act was willful. Based upon the finding of a willful unfair trade practice, the judge trebled the damages and awarded attorney fees.

Dreyfus does not challenge the jury award of $34,861.50 in compensatory damages for breach of contract. Dreyfus argues on appeal that the court should have applied Colorado law, and that Stevenson did not establish a violation by Dreyfus of the New Mexico Unfair Practices Act, NMSA 1978, §§ 57–12–1 to –22 (Repl. Pamp.1987 & Cum.Supp.1990). We affirm the court on its choice of law and reverse on its denial of Dreyfus' motion for a directed verdict on the Unfair Practices Act claim.

## FACTS

Stevenson's father, an employee in the family business, received a call from Jones, the manager of Hill Top Feeders, Inc. (HTF) in which Jones offered to sell cattle owned by Dreyfus. The Dreyfus cattle were being pastured at HTF; and Jones, according to standard industry practice, was authorized to arrange for their sale. After several telephone conversations, the parties agreed to a sale. Jones instructed Stevenson to send a $17,080 down payment check to HTF, which Stevenson did on June 29, 1989.

At the same time, Jones contacted Frank Seckler of Seckler Company, an agent of Dreyfus, to advise him that he could sell some of the Dreyfus cattle at HTF to Stevenson. Seckler prepared a contract for the sale from a written form which he signed on behalf of Dreyfus and sent to Jones to forward to Stevenson. The contract contained the following provision typed in: "Stevenson Brothers must call Seckler Co. in Denver by Nov. 11, 1988 to price the cattle." The contract also provided that "Colorado law shall be binding...." The contract contained no provision for the recovery of attorney fees by either party in the event of a breach.

By July 14, 1988, Stevenson had not heard or received anything from Dreyfus or HTF confirming the sale. He called HTF and Jones assured him "everything was okay." In fact, everything was not "okay." Jones had failed to forward the contract to Stevenson. Jones had also failed to forward the $17,080 down payment from Stevenson to either Seckler or Dreyfus. Consequently, by mid-July 1988, Stevenson believed he had a contract with Dreyfus, while Dreyfus and Seckler thought that Stevenson had failed to sign the contract or make the required down payment. Additionally, about the middle of July 1988, Seckler received information which caused him concern about the care the Dreyfus cattle were receiving at HTF and the possibility they had been double-mortgaged. A Seckler representative sent to HTF found a "real mess." Cattle were missing and not being fed, and HTF was not paying its bills. Seckler had the Dreyfus cattle removed and sold. He also canceled the contract with Stevenson in light of the discovery of what was happening at HTF and because Seckler never received a signed contract or a down payment from Stevenson.

## CHOICE OF LAW

The determination as to the law applicable in a case is a function of the trial court, and this determination is reviewable by the appellate court. *Gonzales v. Garcia*, 89 N.M. 337, 338–39, 552 P.2d 468, 469–70 (1976). Although parties are free to choose by contract a law to govern the performance and enforcement of contractual arrangements between them, *see Nez v. Forney*, 109 N.M. 161, 783 P.2d 471 (1989), the parties in this case did not do so. The written contract, which Dreyfus contends specifies Colorado law as the applicable law, was never executed by Stevenson, nor was it ever presented to Stevenson for

execution. It is elementary in contract law that mutual assent must be expressed by parties to an agreement. *Trujillo v. Glen Falls Ins. Co.*, 88 N.M. 279, 280, 540 P.2d 209, 210 (1975). Acceptance of an offer must be manifestation of unconditional agreement to all of the terms of the offer and an intention to be bound thereby. *Tatsch v. Hamilton–Erickson Mfg. Co.*, 76 N.M. 729, 733, 418 P.2d 187, 189 (1966). Any additional terms in the confirmation of the oral contract merely constituted an offer. *Cf. Polhamus v. Roberts*, 50 N.M. 236, 239, 175 P.2d 196, 198 (1946) (reply to offer which added qualifications was a counter offer). Stevenson was not bound by Colorado law when the only claim that it should apply was founded upon a written instrument that was never signed by the party against whom enforcement was sought. The unexecuted contract was but one piece of evidence which the jury relied on to support an agreement between the parties. The trial court did not err when it held that Colorado law did not apply.

The facts of this case clearly support the trial court's determination to apply New Mexico law over Colorado law. The oral agreement giving rise to the contract between the parties initiated from Roswell, New Mexico. The cattle which were purchased were located in Roswell and delivery was to take place there. The only contact Colorado had with the transaction was that one of its agents lived in that state. The court correctly applied New Mexico law over Colorado law. *See generally State Farm Mut. Ins. Co. v. Conyers*, 109 N.M. 243, 784 P.2d 986 (1989) (analysis of choice of law rules in contract cases).

## UNFAIR PRACTICES ACT

Dreyfus contends that the trial court improperly instructed the jury on the elements of an Unfair Practices Act (Act) violation. *See* NMSA 1978, § 57–12–2(D) (Cum.Supp.1990).[1] We agree.

In the case before us the breach of a contract between two businesses has turned into an unfair trade practice where treble damages and attorney fees have been awarded. Stevenson contends that an unfair trade practice exists under NMSA 1978, § 57–12–2(D)(17), which provides that an unfair trade practice may include the "failure to deliver the quality or quantity of goods or services contracted for." The instruction given to the jury was:

> To establish the claim of a violation of the Unfair Trade Practices Act, Plaintiff has the burden of proving the following contention:
>
> 1. Defendant failed to deliver the quantity of goods contracted for.
>
> Plaintiff contends and has the burden of proving that Defendant's violation of the Unfair Trade Practices Act caused his damages.
>
> Defendant denies the contentions of Plaintiff.

During the course of the jury's deliberations, the jurors attempted to obtain a clarification of the Unfair Practices Act. The jurors delivered a handwritten note to the judge asking "What is the New Mexico Unfair Trade Practices Act?" The court responded: "What information you need regarding the Unfair Trade Practices Act is contained in your instruction."

The import of this instruction is that by failing to deliver the quantity of goods contracted for, Dreyfus knowingly made a false or misleading statement. Under the instruction, the mere fact that Dreyfus failed "to deliver the quantity of goods or services contracted for" would result in every breach of contract case being a violation of the Act; and every party found to have breached a contract by failure to deliver would be automatically liable for attorney fees and potentially liable for treble damages under Section 57–12–10 (Repl. Pamp.1987). We do not believe that the legislature intended such a result.

The New Mexico Act is modeled after the Uniform Deceptive Trade Practices Act

---

1. The action was brought under NMSA 1978, § 57–2–2(C) (Repl. Pamp.1987). The new section, although relettered, is substantively identical to the old.

(Uniform Act). NMSA 1978, § 57–12–1 commentary (Repl.Pamp.1987). "The deceptive trade practices singled out by the Uniform Act can be roughly subdivided into conduct involving either misleading trade identification or false or deceptive advertising." 7A U.L.A. 265, 266 (1985) (prefatory note to Uniform Deceptive Trade Practices Act). The Uniform Act provides a private remedy to persons likely to suffer pecuniary harm for conduct involving either misleading identification of business or goods or false or deceptive advertising. *Id.* In *Ashlock v. Sunwest Bank of Roswell, N.A.*, 107 N.M. 100, 102, 753 P.2d 346, 348 (1988), we stated: "By recognizing that the Act applies to all misleading or deceptive statements, whether intentionally or unintentionally made, we insure that the Unfair Practices Act lends the protection of its broad application to innocent consumers."

The instruction was in error. In *Ashlock* we also dealt with a claim under the same subsection of the statute (failure to deliver quality or quantity of goods). In *Ashlock* we expressly stated that four elements must be established to invoke the Unfair Practices Act, relying on the definition of an unfair trade practice in NMSA 1978, Section 57–12–2(D). First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. *Ashlock*, 107 N.M. at 101, 753 P.2d at 347. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or ... collection of debts." *Id.* Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. *Id.* Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person." *Id.*

After defining an unfair trade practice, the statute then states, "and [the definition] includes, but is not limited to": before

listing examples of conduct which may constitute an unfair trade practice. NMSA 1978 § 57–12–2(D). Among these examples is the subsection relied upon to establish liability under the Act in this case. The conjunctive wording of the statute itself requires an interpretation that the four elements set forth in Section (D) must be present in the examples delineated in subsections (1) through (17). *Cf. Public Serv. Co. v. Public Serv. Comm'n*, 106 N.M. 622, 624, 747 P.2d 917, 919 (1987) (disjunctive meaning given to word "or" unless context of statute demands otherwise). Here, the statute states the definition of an unfair or deceptive trade practice followed by the word "and," not "or."

■ Stevenson contends that a contract which eventually is breached by "failure to deliver quantity of goods contracted for," necessarily means that Dreyfus knowingly made a false or misleading statement. In support, Stevenson appears to rely on the interpretation of our Act in *Ashlock* that a statement, not intentionally unfair or deceptive, could become false or misleading during the life of a transaction. *Ashlock*, 107 N.M. at 101–02, 753 P.2d at 347–48. Interpreting the Act as Stevenson urges, ignores the requirement that the statement be made "knowingly." We agree that the misrepresentation need not be intentionally made, but it must be knowingly made.

Webster's Third New International Dictionary 1252 (1971), defines "knowing" as "having or reflecting knowledge, information, or insight." In *Taylor v. Hanchett Oil Co.*, 37 N.M. 606, 609, 27 P.2d 59, 60 (1933), we stated:

"Knowledge" does not necessarily mean "actual knowledge," but means knowledge of such circumstances as would ordinarily lead upon investigation, in the exercise of reasonable diligence which a prudent man ought to exercise, to a knowledge of the actual facts. One who intentionally remains ignorant is chargeable in law with knowledge.

■ The "knowingly made" requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that

the statement was false or misleading. Thus, for example, in a bait-and-switch, although the party may advertise an item at a special price, and he only has a very limited amount of that particular item, he should be aware that his advertising is misleading.

In this case, evidence was never presented that Dreyfus knowingly made any false or misleading statement of any kind in connection with the negotiation or the oral agreement. As noted above, Dreyfus moved for a directed verdict at trial on the unfair practices claim. All questions of law lie within the province of the trial court, "including the legal sufficiency of any asserted claim or defense." *American Employers' Ins. Co. v. Crawford,* 87 N.M. 375, 376, 533 P.2d 1203, 1204 (1975). The right to a jury trial disappears if the evidence fails to present or support an issue essential to the legal sufficiency of an asserted claim. *Id.* If the evidence adduced fails to support all issues of fact essential to maintaining a legally recognized and enforceable claim, the claim must be dismissed as a matter of law. *Id.* This is what Dreyfus sought by its motion for a directed verdict. The facts established by the record clearly show that Stevenson was not entitled to recover under the Act. Because the second element required to establish an unfair trade practice is missing in this case, it is unnecessary to address the last two. Therefore, the trial court erred when it denied Dreyfus' motion for a directed verdict on the Unfair Practices Act violation claim.

We affirm the trial court on its choice of law, reverse the Judgment upon Jury Verdict, vacate the Order on Attorney's Fees, and remand with instructions that the judgment in favor of Stevenson be reduced to $34,861.50, plus interest from August 3, 1988, and costs in the sum of $1,728.11.

IT IS SO ORDERED.

DAN SOSA, C.J., and
MONTGOMERY, J., concur.