**COCA–COLA BOTTLING COMPANY OF OGDEN, INC., Plaintiff–Appellee,**

**Durango Coca–Cola Bottling Co.; Coca–Cola Bottling Company of Winfield, Kansas, Plaintiffs–Counter–Defendants–Appellees,**

v.

**The COCA–COLA COMPANY, Defendant–Counter–Claimant–Appellant.**

No. 92–2108.

United States Court of Appeals, Tenth Circuit.

Sept. 14, 1993.

Rehearing Denied Oct. 14, 1993.

James R. McGibbon, Sutherland, Asbill & Brennan, Atlanta, GA (J.D. Fleming, Jr., and Williams M. Hames, Sutherland, Asbill & Brennan, Atlanta, GA, Leonard G. Espinosa and Thomas J. Dunn, Moses, Dunn, Beckley, Espinosa & Tuthill, Albuquerque, NM, with him, on the brief, for Durango Coca–Cola Bottling Co. and The Coca–Cola Bottling Co. of Ogden, Inc.; Bruce M. Perry, Todd A. Rossman and William A. Morrow, White, Peterson, Perry, Pruss, Morrow & Gigray, P.A., Nampa, Idaho, with him, on the brief, for The Coca–Cola Bottling Co. of Winfield, KS), for plaintiffs-counter-defendants-appellees.

Michael C. Russ, King & Spalding, Atlanta, GA (Reginald R. Smith, King & Spalding, Atlanta, GA, Alan Konrad, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, NM, with him, on the briefs), for defendant-counter-claimant-appellant.

Before BALDOCK, HOLLOWAY and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

The Coca–Cola Company (Company) appeals the entry of summary judgment in favor of three Coca–Cola bottlers, Coca–Cola Bottling Company of Ogden, Inc., Durango Coca–Cola Bottling Company, and The Coca–Cola Bottling Company of Winfield, Kansas (Bottlers). Each of the Bottlers filed a declaratory judgment action against the Company seeking a determination of their rights and obligations under the original Bottling Contracts and the subsequent 1983 Amendment. The principal issue raised is whether the Company's withholding of consent to arrangements where the Bottlers subcontract all of the bottling to entities known as "agency processors" is unreasonable. The cases were consolidated, and the district court ruled in favor of the Bottlers, holding that the contractual obligations were unambiguous and the Company's position was unreasonable as a matter of law.

## BACKGROUND

The Company distributes its beverage products nationwide through a network of local bottlers. Historically, the Bottlers not only bottled the Coca–Cola product, but also were fully responsible for the distribution of the product within their exclusive territories. Notwithstanding this historical practice, the distribution and bottling of Coca–Cola products has changed substantially with the development of new bottling technologies, the introduction of new packaging materials and containers, and the expansion of the Coca–Cola product line. These recent changes have prompted smaller local bottlers to subcontract their bottling functions to larger bottling operations who can take advantage of the economies of scale. This procedure is referred to as agency processing. Although the Company permits the Bottlers to engage in agency processing, they do not believe the contract, as it is amended, allows the Bottlers to cease production entirely and rely solely on agency processing. Since the Company contends that total reliance on agency processing is prohibited, they assert that the Bottlers must sign a Non–Producing Bottlers Agreement, conceding marketing and transfer concerns to the company. Conversely, the Bottlers insist that the Amendment permitting agency processing includes no limitation regarding the degree of agency processing allowed, and the Company is unreasonably withholding its consent to such agency processing agreements. Therein lies the basis for the present dispute.[1]

---

1.  Ever since the initial agreement delegating exclusive territories to the Bottlers, the relationship

A brief history of the parties' contractual arrangement will be helpful. Upon receipt of exclusive territorial bottling operations from the Western Coca–Cola Bottling Company (Winfield 1936, Durango 1938, and Ogden 1949), each of the Bottlers signed a Bottler's Contract in which the Bottlers agreed to the terms of paragraph FOURTH, addressing quality, marketing, production and trademark concerns of the Company. Although paragraph FOURTH does not explicitly direct the Bottlers to bottle the product on the premises of the Bottler, the Company contends such a local production obligation is implicit in the original contract. Conversely, the Bottlers challenge whether paragraph FOURTH initially imposed an obligation to locally produce.

As the changes in bottling technology began in the 1970s, the Bottlers received Company approval on a case-by-case basis to obtain a portion of their product from agency processors as they were unable to produce all of the product and package requirements in their own processing facilities. Generally, the Company would consent to these temporary processing arrangements but would require the bottler to acknowledge that the arrangement did not alter the bottler's contractual obligation to bottle the beverages. In 1977, the Company adopted a standard "Temporary Processing Agreement" (TPA), which had a one-year duration and acknowledged the Bottlers' obligation to invest in plant and equipment and recognized the Agreement in no way modified the respective rights and obligations of the parties under the original contract.

The introduction of diet Coke in 1982 prompted a new round of Company and Bottlers negotiations. These negotiations provide the immediate backdrop for the present dispute. The Company considered diet Coke a new product which would necessarily mandate a new contract, enabling the Company to sell diet Coke to the Bottlers under a higher price formula. Conversely, Bottlers

representatives argued the existing contract still governed diet Coke since it was essentially the same product with a different sweetener. The 1983 Amendment emerged as a compromise from this dispute and modified the existing Bottlers' Contracts. In exchange for receiving a favorable price formula for diet Coke, the Company agreed to a number of concessions. For example, paragraph 2.3 provided the Bottlers' rights are perpetual and may be terminated only for a material breach; paragraph 9 allowed the Bottler to select which products to promote in its territory; and paragraph 14.5 assured that the Company would not use onerous quality control specifications. Among these concessions, the Company recognized Bottlers may be party to agency processing agreements in paragraph 9.2. Under paragraph 9.2, the Company agreed that they "shall not unreasonably withhold (i) any consents ... or (ii) approval" to agency processing agreements. Although the Company presently acknowledges paragraph 9.2 of the 1983 Amendment allows agency processing, they have notified the Bottlers that they will withhold consent to arrangements where the Bottlers intend to rely exclusively on agency processing. The Company has proffered numerous business justifications attempting to demonstrate their withholding of consent is not unreasonable as provided in paragraph 9.2.

Meanwhile in 1982, the Company began to develop a policy to regulate Bottlers who ceased production at their facilities entirely and relied solely on agency processing. The Company and Bottlers representatives eventually negotiated a Non–Producing Bottlers Agreement (NPBA), which allows Bottlers to terminate production in exchange for various contractual concessions. These concessions include stock transfer restrictions, performance obligations, and marketing controls. Although the Bottlers in this action are non-producing, they continue to operate without signing an NPBA.[2] The Company insists

---

between the Coca–Cola Bottlers and the Company has been strained, as the self-interest which motivates each party often conflicts with that of the other. See Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co., 696 F.Supp. 97, 98–104 (D.Del.1988) (provides a detailed history of

the struggle between the Company and its bottlers leading up to present day disputes).

**2.** There is some evidence that Durango continues to bottle its own premix products, which constitutes over five per cent of Durango's total net

that unless the Bottlers sign an NPBA or commence production they are in violation of the original contract. The Bottlers filed this declaratory judgment action to determine whether under the Bottlers' Contract as amended it is unreasonable for the Company to withhold its consent to agency processing arrangements in which the Bottlers subcontract all of the bottling.

The declaratory judgment action was brought under diversity jurisdiction, 28 U.S.C. § 1332 (1988), in the federal district court of New Mexico, and is thereby governed by New Mexico choice of law rules. *See Moore v. Subaru of America,* 891 F.2d 1445, 1448 (10th Cir.1989). The parties agree that under New Mexico's choice of law rules, the applicable law for the interpretation of a contract is the law in the state where the final act necessary for the formation of the contract is performed. *Spiess v. United Servs. Life Ins. Co.,* 348 F.2d 275, 276 (10th Cir.1965); *Eichel v. Goode, Inc.,* 101 N.M. 246, 250–51, 680 P.2d 627, 631–32 (App. 1984). The parties do not dispute that the last act necessary for the formation of the Bottlers' Contract and the 1983 Amendment occurred in Atlanta, making Georgia law controlling.[3]

The district court in ruling from the bench found the Bottlers' duty to bottle under the original contract was unambiguously modified by paragraph 9.2 in the 1983 Amendment, and the Company's withholding of consent to allow agency processing for all of the Bottlers' production is unreasonable. The Company appeals the district court's entry of summary judgment on three grounds. First, appellant contends the district court erred in holding that paragraph 9.2 of the 1983 Amendment unambiguously amended the Bottlers' Contract. Second, the Company argues the district court erred by not finding paragraph 9.2 vague and unenforceable under Georgia law. Third, appellant argues the

district court erred in determining the Company's withholding of consent was unreasonable as a matter of law. The Bottlers, in turn, alternatively assert the original Bottlers' Contract imposed no local production obligation upon them in the first instance.

We review the grant or denial of summary judgment de novo and apply the same legal standard used by the district court under Fed.R.Civ.P. 56(c). *Eaton v. Jarvis Products Corp.,* 965 F.2d 922, 925 (10th Cir.1992). Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment. *Eaton,* 965 F.2d at 925.

## OBLIGATIONS UNDER THE ORIGINAL BOTTLERS AGREEMENT

■ We must first resolve whether a local production obligation was created under the original Bottlers' Contract. Although the Bottlers acknowledge they had a duty to bottle under the original Bottlers' Contract, they contend the original contract did not require them to bottle the beverages locally. Instead, the Bottlers argue agency processing was built into the original contract from the outset. The Company, conversely, asserts a duty to bottle locally can be inferred from paragraph FOURTH of the original contract. The district court merely stated the "bottlers had a duty to bottle under the original ... contract," but did not make any specific findings regarding a local production obligation.

" 'The cardinal rule of construction, to which all others are subordinate, is to ascertain the intention of the parties, and in order to do this the language of the agreement

revenues. For the purposes of this opinion, however, we will address the issues as if all Bottlers relied exclusively upon agency processing.

3. While not mentioned by the parties, more recent cases from New Mexico suggest that New Mexico may have adopted a totality of the circumstances approach, i.e., giving due weight to all the various elements. *See Stevenson v. Louis*

*Dreyfus Corp.,* 112 N.M. 97, 98–99, 811 P.2d 1308, 1309–10 (1991); *State Farm Mut. Ins. Co. v. Conyers,* 109 N.M. 243, 247–48, 784 P.2d 986, 990–91 (1989). As the parties have not raised or asserted this as error, we will not now consider this aspect and we assume the choice of law rules employed by the district court now constitute the law of the case.

should be considered in the light of the attendant and surrounding circumstances.'" *Foster v. Nix,* 173 Ga.App. 720, 327 S.E.2d 833, 837 (1985) (citation omitted). In exchange for receiving exclusive bottling territories in the original Bottlers' Contract, the Bottlers agreed to numerous Company concerns regarding production. Specifically, under sections (a)-(d) of paragraph FOURTH, the contract obligates the Bottlers to deal exclusively with the Company, prohibits the Bottlers from manufacturing fountain syrup, prescribes the manner in which the beverage shall be bottled, and sets the prices for which the Bottlers can obtain ingredients. Implicit in these sections is the understanding that the Bottler would perform its own bottling. Moreover, section (e) requires the Bottlers:

> [t]o invest in a plant and equipment, and to keep up said plant and equipment in such a condition as will be sufficient to meet satisfactorily the demands of the business in the territory herein referred to, and to increase such investment in said business as the demand for COCA–COLA in bottles in said territory may require.

It would be nonsensical for the Company to require the Bottlers to invest in a plant and equipment and to increase investment "as the demand for COCA–COLA in bottles in said territory may require," if the Contract did not obligate the Bottlers to perform their own bottling. Therefore, a fair reading of the language in section (e) imposes a duty upon the Bottlers to bottle the product at their local facilities.

Section (g) is also indicative of the parties' original intent. It obligates the Bottlers "[n]ot to use the name COCA–COLA, nor bottle nor vend said product except in the territory herein referred to. This limitation, however, is not to prevent [the Bottlers] from obtaining such rights from parties authorized to use the name COCA–COLA, and to bottle and vend said product."

The Bottlers contend section (g) permits agency processing from the outset. We reject such an interpretation. The first sentence clearly limits Bottlers to produce and distribute Coca–Cola within their own territory. The second sentence of section (g), however, clarifies that the exclusive territory

bottling agreements are transferable. This sentence refers to a Bottler's prerogative to acquire another Bottler's exclusive territorial rights to bottle and *vend.* Consequently, this exception applies exclusively to acquisitions and was not intended to address subcontracting. Although paragraph FOURTH never explicitly states the Bottlers have a duty to locally produce, such an interpretation is necessarily apparent when all of the sections of paragraph FOURTH are read together. Thus, under the original contract, the parties intended for the Bottlers to bottle within their own territory.

## EFFECT OF 1983 AMENDMENT ON THE LOCAL PRODUCTION OBLIGATION

■ We must now resolve the effect of the 1983 Amendment on the Bottlers' local production obligation. The Bottlers contend paragraph 9.2 of the 1983 Amendment abrogates their local production obligation. Paragraph 9.2 reads as follows:

> The Company and the Bottler acknowledge that each is or may become a party to one or more agreements authorizing a bottler or other Company-authorized entity to produce finished products for sale by another bottler. Such agreements include, but are not limited to, (i) agreements permitting bottlers, subject to the provisions of Section 3 hereof, to commence or continue to manufacture Covered Products for other bottlers and (ii) agreements pursuant to which bottlers may have Covered Products manufactured for them by other Company-authorized entities. It is hereby agreed that the Company shall not unreasonably withhold (i) any consents required by such agreements or (ii) approval of [Bottlers'] participation in such agreements. Except as may be modified herein and without extending the term thereof, any such existing agreements shall remain in full force and effect.

Because paragraph 9.2 permits the Bottlers to acquire the finished product from other facilities, the Bottlers contend the local production obligation is necessarily modified.

The Company, in response, raises a number of linguistic and contextual arguments to

refute this approach. The Company argues the language in paragraph 9.2 is ambiguous, since it does not explicitly address the Bottlers' production obligation under the original contract. Because of this ambiguity, the Company urges the consideration of extrinsic evidence. When introducing extrinsic evidence, the Company contends the only other "existing agreements" in force at the time paragraph 9.2 was enacted were Temporary Processing Agreements and Non–Producing Bottler Agreements. Therefore, the Company's position continues, the only benefits which the Bottlers may derive from paragraph 9.2 are those available under a TPA or an NPBA. Thus, the availability of the TPA and NPBA as well as other extrinsic evidence demonstrate that paragraph 9.2 did not contemplate the Bottlers' total reliance on agency processing. Moreover, although paragraph 9.2 validates agency processing, the last sentence cautions "[e]xcept as may be modified herein and without extending the term thereof, any such existing agreements shall remain in full force and effect." The Company contends the existing local production obligations derived from paragraph FOURTH of the original contract still bind the Bottlers. Thus, it would contradict the local production obligation to allow them to cease production and rely exclusively on agency processing.

"The construction of a contract is a question of law for the court." Ga.Code Ann. § 13–2–1 (Michie 1990). "The cardinal rule of construction is to ascertain the intention of the parties." Ga.Code Ann. § 13–2–3 (Michie 1990). "Where the terms of a written contract are clear and unambiguous, the court will look only to the contract to find the intention of the parties. No construction of a contract is required or permitted when the language used by the parties is plain, unambiguous, and capable of only one reasonable interpretation." *Hunsinger v. Lockheed Corp.*, 192 Ga.App. 781, 386 S.E.2d 537, 539 (1989) (citations omitted). Parol evidence should not be considered when the terms of the contract are unambiguous. *Smith v. Standard Oil Co.*, 227 Ga. 268, 180 S.E.2d 691, 692 (1971); *see also* Ga.Code Ann. § 13–2–2 (Michie 1990).

The fundamental scope and effect of paragraph 9.2 is that the Company and Bottlers agree to agency processing. Paragraph 9.2 permits Bottlers to become party to "agreements pursuant to which bottlers may have Covered Products manufactured for them by other Company-authorized entities." Because the 1983 Amendment explicitly permits agency processing, the original Bottlers' Contract is modified to the extent that it requires a local production obligation on bottlers who engage in agency processing. Such an interpretation is dictated by the plain meaning of paragraph 9.2. The only limitation paragraph 9.2 places on agency processing is that "the Company shall not unreasonably withhold (i) any consents required by such agreements or (ii) approval of a [Bottlers'] participation in such agreements." In formulating this section to the 1983 Amendment, the Company could have bargained for a provision limiting the amount of agency processing in which a Bottler may engage. Since the Amendment does not contain such limiting language, we must refrain from reading it in, as the function of a court is to construe contracts, not to revise them. *Kelson Companies, Inc. v. Feingold*, 168 Ga.App. 391, 309 S.E.2d 394, 396 (1983). Thus, paragraph 9.2 unambiguously modifies the Bottlers' local production obligation by permitting agency processing, and incorporates no limitation regarding the extent to which Bottlers may use agency processing.

## THE ENFORCEABILITY OF "UN-REASONABLE" LIMITATION IN PARAGRAPH 9.2

In the alternative appellant asserts the contract language in paragraph 9.2 which mandates that "the Company shall not unreasonably withhold (i) any consents ... or (ii) approval" regarding agency processing agreements is too vague to be enforceable. Thus, paragraph 9.2 would be inapplicable and the Bottlers would still be bound by their local production obligation under the original contract. Appellant relies on *Patel v. Gingrey Assocs.*, 196 Ga.App. 203, 395 S.E.2d 595, 597 (1990), for the proposition that "[a]n agreement merely not to be 'unreasonable' in the future is so uncertain, indefinite, and vague that it cannot be an enforceable con-

tract." The Bottlers contend the facts in *Patel* are distinguishable from the present case and the applicable Georgia law is articulated in *Stern's Gallery of Gifts, Inc. v. Corporate Property Investors, Inc.*, 176 Ga.App. 586, 337 S.E.2d 29 (1985). We will compare the facts and holdings in each of these cases to determine the controlling Georgia law.

The plaintiff in *Patel* purchased all of the stock in a motel in exchange for a secured promissory note. The plaintiff also received assurances that the seller would " 'allow a future sale of the stock of [the motel] and or the property . . . to a qualified buyer if the purchaser is first approved by [him], and to not unreasonably withhold [his] approval.' " *Patel,* 395 S.E.2d at 596 (citation omitted). The *Patel* court stated, "[t]he agreement not to be 'unreasonable' does not convey with reasonable certainty what [the party providing consent] was obligated to do." *Id.* at 597. The district court found *Patel* inapplicable and instead relied on *Stern's Gallery.*

In *Stern's Gallery,* the court enforced an agreement in which the landlord assured the lessee that it would not unreasonably withhold its consent to sublet. The court was not troubled that the term "unreasonable" was vague or indefinite and instead held the term "must refer to considerations of fairness and commercial reasonableness." *Stern's Gallery,* 337 S.E.2d at 36. Upon rehearing granted in *Patel,* the Georgia court reconciled the two cases.

> We find *Stern's Gallery* to be distinguishable because the provision in that case was subject to enforcement on commercial reasonableness standards. Such standards are inapplicable to the agreement in this case since [the secured party's] agreement reserved his right of approval of even qualified, i.e., commercially reasonable, buyers, and thus eliminated commercial reasonableness as a standard for determining what was unreasonable.

*Patel,* 395 S.E.2d at 598. Thus, as long as commercial reasonableness can be used as a guidepost to determine whether the withholding of consent is unreasonable, the contract is not indefinite and may be enforced.

The Company points out that paragraph 9.2 permits agency processing by "Company-authorized entities" and equates it with the phrase "qualified buyer" in *Patel.* Appellant argues that because agency processing is only permitted with "Company-authorized entities", the language forbidding the Company from unreasonably withholding its consent leaves no commercially reasonable standard and therefore is indefinite as in *Patel.* Taken one step further, the Company asserts it is unclear on what basis the Company may reasonably withhold consent for agency processing when it has already approved of the agency processors.

We reject the Company's argument. The Company may indeed have commercially reasonable grounds for withholding consent to agency processing agreements with Company authorized entities. Simply because the Company allows "a bottler or other Company-authorized entity" to engage in agency processing does not necessarily mean that the Company automatically approves every agency processing *agreement,* rendering the "unreasonably withhold" language indefinite. The Company may assert potentially commercially reasonable justifications in disapproving specific agreements outside of the fact that the agency processors are not sufficiently qualified. For instance, it might be commercially reasonable for the Company to disapprove of an agency processing agreement with an authorized Company entity because the Company fears that the increase in production at the agency processing plant would be detrimental to that plant's quality standards. Thus, each agency processing agreement must be judged according to its own merit under a reasonableness standard even though the Company has already authorized the agency processor to bottle.

## REASONABLENESS DETERMINATION

■ The district court found that it is unreasonable for the Company to "withhold its consent given the dire consequences to the plaintiffs if forced to perform their own bottling." [4] We reiterate that the granting of

---

4. In holding the Company's conduct unreasonable, the district court improperly focused on the reasonableness of the Company's decision by examining the impact on the Bottler. The issue is

summary judgment is subject to de novo review. We consequently must review the record to ascertain whether there is a genuine issue as to a material fact regarding the reasonableness of the Company's policy to withhold consent on agency processing arrangements where the Bottler produces nothing at its facilities.

As a matter of contract interpretation, the Bottlers argue the justifications given by the Company for withholding its consent were not contemplated in the drafting of paragraph 9.2. In paragraph 9.2, which evolved as a compromise in drafting the 1983 Amendments, the Company conceded it would allow agency processing. The only limitation placed on agency processing agreements was that the Company would not "unreasonably withhold (i) any consents ... or (ii) approval." The Bottlers argue the justifications presently asserted by the Company in withholding its approval were already conceded in paragraph 9.2 by allowing agency processing. The Bottlers assert that in plain and palpable cases a reasonableness determination may be made by a court as a matter of law. *Stern's Gallery,* 337 S.E.2d at 38.

The Company asserts they have offered some reasonable justifications in support of its decision to withhold consent. The Company alleges they originally drafted the NPBA to address legitimate concerns relating to nonproducing bottlers. Based on these same concerns, the Company proffered at least four rationales through affidavits, depositions, and interrogatory responses included in the record in support of its decision. First, the Company contends the absence of production facilities in a particular territory could reduce the Bottlers' incentive to increase investment, marketing, and production. Second, the presence of local production facilities increases the Bottlers' permanence and encourages local identification. Third, nonproducing Bottlers are more likely to transfer their exclusive territorial rights to a non-desirable entity. Fourth, without Bottlers producing in each territory, the Company is concerned that they would lose their

business, legal and political justifications for the exclusive territorial arrangement they enjoy under the Soft Drink Interbrand Competition Act (15 U.S.C.A. § 3501 et seq. (West 1982)).

Because we find the language in paragraph 9.2 unambiguous, it is unnecessary to consult the canons of contract construction. Instead, we look to the plain meaning of the language employed in paragraph 9.2. The first two sentences read as follows:

The Company and the Bottler acknowledge that each is or may become a party to one or more agreements authorizing a bottler or other Company-authorized entity to produce finished products for sale by another bottler. Such agreements include, but are not limited to, (i) agreements permitting bottlers, subject to the provisions of Section 3 hereof, to commence or continue to manufacture Covered Products for other bottlers and (ii) agreements pursuant to which bottlers may have Covered Products manufactured for them by other Company-authorized entities.

The clear import of these first two sentences is the Company acquiesced to agency processing and all of the attendant effects it has on the Bottler. Under the plain language of the contract, the phrase "unreasonably withhold ... consents ... or approval" naturally only gives the Company authority to reasonably withhold consent on matters which were not conceded by allowing agency processing in the first place. The Company promises to withhold its consent because an arrangement allowing complete agency processing would allegedly: reduce the Bottlers' incentive to increase investment, marketing and production; decrease Bottlers' permanence and local identification; more likely permit the transfer of territorial rights to a nondesirable entity; and cause the Company to lose its business, legal and political justifications in support of their exclusive territorial arrangement. At the summary judgment stage, it is not the function of the court to weigh the merits of the Company's asserted justifications. *See Anderson v. Liberty Lobby, Inc.,*

more properly phrased as whether the Company asserted reasonable justifications from its perspective in support of its decision to withhold

consent. *See Perez v. Jefferson Standard Life Ins. Co.,* 781 F.2d 475, 479–80 (5th Cir.1986).

477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). We therefore restrict our analysis to determine whether the Company's justifications fall within the scope of the limiting language of paragraph 9.2. In essence, does the phrase "the Company shall not unreasonably withhold (i) any consents . . . or (ii) approval" encapsulate the reasons asserted by the Company?

Thus, the justifications proffered by the Company were considered and bargained away when the parties negotiated paragraph 9.2. The justifications asserted in the present dispute are the inherent effects of agency processing. These justifications apply to any agency processing agreement, not just those where the Bottler desires to delegate all of its bottling. For instance, both complete agency processing and partial agency processing discourage the investment in plant and equipment. The same analysis applies to the Bottlers' permanence, likelihood of transfer to an undesirable party, and the justification in support of exclusive territorial arrangements. Thus, the Company's objections are merely to the degree of agency processing, and paragraph 9.2 imposes no limitation on the percentage of agency processing in which a Bottler may engage. Such a restriction could have easily been included in the Amendment. In acquiescing to agency processing in paragraph 9.2, the Company received valued consideration for that capitulation in the rest of the 1983 Amendment. Therefore, the justifications given by the Company are not "reasonable" as contemplated by the parties. If we were to allow the trier of fact to make a reasonableness determination on the justifications provided by the Company, we would nullify the import of paragraph 9.2 allowing agency processing in the first place.

We need not determine under what situations the Company may reasonably withhold its consent but note that it must relate to a specific agreement, and it must be for reasons not already bargained away in the drafting of the Bottlers' Contract or its amendment. Because the Company has offered justifications which fall outside the intended definition of the phrase "unreasonably withhold consent," we note that no factual dispute remains in interpreting the contract. Conse-

quently, the district court properly entered summary judgment.

In summary, we uphold the district court's interpretation of the contract insofar as the Bottlers' local production obligations derived from the original contract are abrogated by paragraph 9.2 of the 1983 Amendment. The court correctly determined that the "unreasonably withhold" phrase is not indefinite or vague under Georgia law. Ultimately, we hold that because the Company's proffered justifications for withholding consent fall outside the bounds of the contract, no factual dispute exists, and as a matter of law summary judgment was appropriately granted.

**AFFIRMED.**