1997-NMSC-042

945 P.2d 985

Kenneth **RUMMEL**, individually and as assignee of Circle K, Inc., a Texas corporation, and as the assignee of ISLIC, Inc., an Illinois corporation, Plaintiff–Appellant,

v.

**ST. PAUL SURPLUS LINES INSURANCE COMPANY**, a Delaware corporation, and Harbor Insurance Company, a California corporation, Defendants–Appellees.

No. 23606.

Supreme Court of New Mexico.

Aug. 8, 1997.

Certiorari Denied Sept. 15, 1997.

McGinn & Associates, Randi McGinn, Albuquerque, for Plaintiff–Appellant.

Madison, Harbour & Mroz, Robert J. Mroz, Robert E. Hansen, Bradley & McCulloch, P.A., Gordon McCulloch, Albuquerque, for Defendants–Appellees.

## OPINION

BACA, Justice.

1. Appellant Kenneth Rummel appeals from a district court order granting two motions for partial summary judgment in favor of Appellees, Harbor Insurance Company (Harbor) and St. Paul Surplus Lines Insur-

ance Company (St. Paul).[1] The district court found that, as a matter of law, neither insurance company was exposed to liability for a judgment entered against their insured, Circle K. On appeal we address whether the district court erred in concluding as a matter of law that neither the Harbor, nor the St. Paul, insurance policies provided coverage for the judgment. We note jurisdiction over this contractual dispute pursuant to Rule 12–102(A)(1) NMRA 1994 (prior to Sept. 1, 1995 amendment) (claims sounding in contract). We affirm the order of summary judgment in favor of Harbor and reverse the order of summary judgment in favor of St. Paul.

## I.

2. Rummel was severely beaten while attempting to stop a robbery at the Circle K store where he worked. Rummel's efforts to thwart the robbery attempt were made in accordance with a Circle K policy requiring clerks to confront shoplifters. He sustained extensive physical injuries, including permanent brain damage. Rummel filed a lawsuit against his employer, claiming that Circle K was responsible for his injuries, and received a judgment in his favor in the amount of $1,042,844.28 compensatory damages and $10,700,000 punitive damages.

3. At the time that the judgment was entered, Circle K was insured under a multi-level insurance package composed of policies issued by five different insurance companies and providing $26,000,000 in coverage. The insurance companies participating in this coverage scheme were Columbia Casualty Company (Columbia), International Surplus Lines Insurance Company (ISLIC), Lexington Insurance Company (Lexington), Harbor, and St. Paul. Circle K was self-insured for the initial $250,000 of liability. The primary insurance carrier, Columbia, issued a policy providing for the next $750,000 of liability. The ISLIC policy offered coverage for $5,000,000 worth of liability and Lexington's policy provided coverage in the amount of $10,000,000, with an express exclusion of coverage for punitive damages. The current

controversy involves policies issued by St. Paul and Harbor, each providing $5,000,000 in coverage.

4. Rummel unsuccessfully sought payment of his judgment, attempting to enter into settlement negotiations with Circle K's insurers. All of the insurance companies except ISLIC declined to participate in settlement negotiations, contending that they were not responsible for payment of any portion of the judgment. ISLIC entered into a settlement agreement with Rummel. The relevant terms of the settlement agreement included Rummel's receipt of a $500,000 unsecured claim in Circle K's bankruptcy in satisfaction of Circle K's self-insured obligation of $250,000, which was credited as payment towards the compensatory damage claim. ISLIC also paid Rummel $1,625,000. Circle K received over $100,000 in reimbursement from ISLIC for the workers' compensation benefits paid to Rummel. The settlement agreement provided that ISLIC had fully satisfied its policy limits of $5,000,000, and credited that payment against the punitive damages award. The settlement agreement assigned Rummel all of the claims which Circle K was entitled to bring against its insurers. Once the settlement agreement had been finalized, Rummel, both independently and as assignee of Circle K, brought suit against the remaining insurers, including Harbor and St. Paul, to collect the remainder of the judgment.

5. Harbor denied liability for any portion of Rummel's judgment, contending that the Harbor policy excluded coverage of punitive damages, allowing Harbor to avoid liability for any unpaid portion of the judgment consisting of punitive damages. The district court agreed and granted Harbor's motion for partial summary judgment.

6. St. Paul also denied liability under the judgment. St. Paul's motion for partial summary judgment alleged that the terms of the St. Paul policy incorporated the punitive damages exclusion of the Lexington policy, effectively relieving St. Paul of liability for the punitive damages portion of the judg-

---

1. Summary judgment was only partial because the trial court had not yet resolved the claim of abuse of process.

**770**

ment sought by Rummel. In addition, St. Paul alleged that the judgment was not large enough to reach the threshold limits of the St. Paul policy. The district court agreed and granted partial summary judgment in favor of St. Paul.

## II.

7. The question before us is whether the district court erred in concluding that there were no genuine issues of material fact as to whether the Harbor and St. Paul policies provide coverage for the unsatisfied punitive damages portion of the judgment obtained by Rummel against Circle K. The pivotal issue is whether the Harbor and St. Paul policies effectively excluded punitive damages from their coverage. Rummel asserts that St. Paul and Harbor are responsible for approximately $6,697.818 in punitive damages and interest which has accrued on the judgment. Thus, only if the Harbor or St. Paul policy failed to effectively exclude coverage of punitive damages should the district court have evaluated whether the policy imposed some liability for the judgment on the insurer.

8. We conclude that the Harbor policy unambiguously excludes punitive damages from coverage and affirm the district court's grant of summary judgment. However, we conclude that the St. Paul policy failed to effectively exclude punitive damages from coverage. Reading the St. Paul policy to provide coverage for punitive damages, we identify an ambiguity in the policy which requires a remand of this case to the trial court for evaluation of the intent of the parties in including language restricting coverage to losses in excess of $15,000,000. In resolving that contract ambiguity, the trial court can also determine whether St. Paul is liable for any portion of Rummel's punitive damages award.

9. The extreme remedy of summary judgment must be used with caution. *See Pharmaseal Labs., Inc. v. Goffe*, 90 N.M. 753, 756, 568 P.2d 589, 592 (1977). In reviewing a grant of summary judgment this Court makes all inferences in favor of the non-movant, interpreting all material facts in favor of requiring a trial on the merits. *Id.* Where there is a question as to any issue of

material fact, summary judgment is inappropriate. *Id.* In reviewing a grant or denial of summary judgment, this Court considers the undisputed facts, and determines whether under those facts summary judgment was proper as a matter of law. *See Fleming v. Phelps–Dodge Corp.*, 83 N.M. 715, 716, 496 P.2d 1111, 1112 (Ct.App.1972). Where the trial court's grant of summary judgment is founded on a mistake of law, the case should be remanded so that the issues may be resolved through application of correct law. *See Rummel v. Lexington Ins. Co.*, 1997 NMSC 041 ¶ 16, 123 N.M. 752, 945 P.2d 970 (1997).

10. This contract dispute requires a determination of whether two insurance contracts are ambiguous. Questions of contract ambiguity are questions of law and are reviewed de novo. *See Mark V, Inc. v. Mellekas*, 1993 NMSC 001, 114 N.M. 778, 782, 845 P.2d 1232, 1236. Ambiguity is present where a contract can reasonably and fairly be subject to several different interpretations. *See Knowles v. United Servs. Auto. Ass'n*, 1992 NMSC 028, 113 N.M. 703, 705, 832 P.2d 394, 396. In evaluating whether a contract is ambiguous as to coverage we can consider the four corners of the contract, as well as the surrounding circumstances of the contract creation. *See C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 509, 817 P.2d 238, 243 (1991). This Court's interpretation of an insurance contract will take into consideration the reasonable expectations of the insured. *See* 2 Lee R. Russ, *Couch on Insurance 3d* § 22:11 (1996). Where an insurance company fails to clearly exclude coverage of punitive damages and an insured reasonably expects such coverage, the contract will be construed against the insurer responsible for drafting the contract. *See Baker v. Armstrong*, 106 N.M. 395, 396–97, 744 P.2d 170, 171–72 (1987). Where ambiguities exist as a result of the insurer's unsuccessful attempt to exclude punitive damages, this Court can remand the case to the trier of fact for consideration of the facts and circumstances surrounding the formation of the contract which might enlighten the court as to the true intent of the contracting parties. *Mark V*, 114 N.M. at 781, 845 P.2d

at 1235 ("Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact."). In the absence of extrinsic evidence necessitating otherwise, ambiguities will be resolved in favor of the insured.

### A.

11. We begin by determining whether the Harbor policy unambiguously excludes coverage for punitive damages, protecting Harbor from liability for any portion of Rummel's punitive damages award. The Harbor policy does not contain an express exclusion of coverage for punitive damages. Rummel cites *Baker* for the proposition that, where an insurance policy fails to expressly exclude punitive damages from coverage, the policy must be construed to include coverage of punitive damages. While *Baker* does address exclusion of punitive damages from coverage under an insurance policy, *Baker* does not require specific language to effectuate a punitive damages exclusion. Rather, *Baker* establishes that a contract may exclude coverage of punitive damages in any manner which would bring the exclusion to the attention of the average insured. *See Baker*, 106 N.M. at 396, 744 P.2d at 171 ("A court should not construe an exclusion of liability for punitive damages where there is nothing in the insuring clause to forewarn an insured that such was to be the intent of the parties.").

12. Acknowledging the validity and utility of a technique utilized by insurance companies around the country, we now hold that where there are several layers of liability insurance, as there are in this case, exclusion of punitive damages can be accomplished through reference to the exclusions of underlying policies, without expressly stating what those exclusions are, provided that the exclusion would be apparent to the average insured. *See, e.g., Crown Ctr. Redevelopment Corp. v. Occidental Fire & Cas. Co.*, 716 S.W.2d 348, 351 (Mo.Ct.App.1986) ("[T]he provisions of the underlying policy are incorporated by reference into the excess policies. . . ."). This type of insurance policy is known as a follow or following form policy. Follow forms are well recognized and widely used in commercial insurance policies. *See, e.g., Admiral Ins. Co. v. Rockwell*, 515 So.2d 246, 247 (Fla.Dist.Ct.App.1987) ("[A] following form policy incorporates and adopts the conditions of the policy of insurance immediately preceding it."); *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal. App.4th 1, 52 Cal.Rptr.2d 690, 725 (1996) (reviewing underlying insurance policy which contained language limiting products liability coverage where excess insurer utilized follow form to adopt that language). Allowance of follow forms is practical: repetition of the same exclusions in each policy of a multi-level insurance package would be cumbersome. Additionally, follow forms are utilized in multiple-layer insurance packages because they ensure more uniform coverage and facilitate spreading risks among insurers. *See Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal.App.4th 715, 15 Cal.Rptr.2d 815, 827 (1993). We now clarify that where a policy fails to explicitly exclude coverage of punitive damages, and instead adopts a punitive damages exclusion through use of a follow form, the exclusion will be enforced provided the exclusion would have come to the attention of the average insured.

13. In the instant case, the Harbor policy provides that "[t]his Policy is subject to the same . . . exclusions . . . as are contained in . . . the Underlying Umbrella Policies stated in Item Two of the Declarations." Item Two of the declarations page lists ISLIC and Lexington as the underlying umbrella policies. The Lexington policy explicitly excludes liability for punitive damages while the ISLIC policy contains no provision addressing punitive damages. Thus, Harbor's policy, in adopting the exclusions of the underlying insurance policies, can only be subject to one interpretation: the policy adopts the punitive damages exclusion of Lexington. The policy provides Rummel, as assignee of Circle K, with forewarning that punitive damages are excluded from coverage. The language is not reasonably and fairly susceptible of different constructions. We hold that the Harbor policy effectively excludes coverage of punitive damages.

14. The district court was correct in concluding as a matter of law that the Harbor

policy excluded punitive damages, and consequently that Harbor was not liable for any portion of Rummel's punitive damages award. We affirm the grant of summary judgment in favor of Harbor.

### B.

15. Next we evaluate whether the district court erred in concluding that there was no question of material fact relevant to St. Paul's liability for the punitive damages portion of the judgment. St. Paul claims that their insurance policy excludes liability for punitive damages, relieving them of responsibility for any portion of the $6,697,818 in punitive damages that Rummel is attempting to recuperate. St. Paul also argues that Circle K did not suffer sufficient losses to activate the St. Paul policy, which contains a provision limiting coverage to losses over $15,000,000. We conclude that St. Paul failed to unambiguously exclude coverage of punitive damages from their policy, leaving ambiguous the contract term restricting coverage to losses in excess of $15,000,000. The contract ambiguity must be resolved by the trial court in order to determine whether St. Paul is liable for any portion of Rummel's punitive damages award.

16. The St. Paul insurance policy, like the Harbor policy, fails to provide an express exclusion of liability for punitive damages, relying instead on the follow form technique and adopting the exclusions contained in the immediately underlying policy. The contract defines the immediately underlying policy as that policy which provides the immediately preceding layer of coverage. The St. Paul declarations page lists ISLIC, Lexington, and Harbor as underlying insurance policies, without specifying which policy constitutes the immediately preceding layer of coverage. Again Rummel argues that, absent an express exclusion of punitive damages, such coverage should be inferred. We have already addressed this argument, holding that follow form policies may exclude punitive damages by referencing the exclusions contained in an underlying policy, provided that such reference is sufficiently clear. Thus, we are left to consider whether the St. Paul policy complies with the dictates of *Baker*

and unambiguously adopts a punitive damages exclusion from an underlying policy.

17. The St. Paul policy adopts the exclusions of the immediately preceding layer of coverage, without specifying which policy is immediately preceding. Both Rummel and St. Paul offer possible interpretations of this contract language. According to St. Paul, when reading all of the policies together it is clear that Lexington provides the immediately preceding layer of coverage and Lexington's policy contains a clear exclusion of coverage for punitive damages. St. Paul reaches this conclusion by evaluating the premiums paid for each insurance policy. St. Paul assumes that Circle K paid progressively lower premiums for each layer of coverage, with the lowest premiums being paid for the uppermost layer of coverage. Thus, St. Paul and Harbor shared the uppermost layer of coverage because they charged identical low premiums. The next lowest premium was charged by Lexington. St. Paul concludes that Lexington is the immediately preceding layer of insurance to both St. Paul and Harbor.

18. Rummel proposes several alternative interpretations of the St. Paul policy, each constituting an interpretation which an average insured might have understood the policy to have adopted. For example, Rummel notes that one of the three policies listed on the declaration sheet is the immediately preceding layer of coverage. Rummel proposes that the average insured might assume that the policy listed first on the declarations sheet was the immediately preceding layer of coverage. Under this scenario, ISLIC appears first on the declarations page and would be the immediately preceding layer of coverage. ISLIC's policy does not provide an exclusion for punitive damages. Rummel offered several additional interpretations of the contract. While St. Paul, the insurance company responsible for drafting the contract, may be able to identify flaws in Rummel's proposed interpretations of the contract, we evaluate the existence of an ambiguity with consideration for the understanding of an average insured.

19. The proposed alternative readings of the St. Paul policy serve to illustrate

the ambiguity created by St. Paul's reference to the immediately preceding layer of coverage, without specifying which policy was immediately preceding. St. Paul failed to comply with the *Baker* requirement that the punitive damages exclusion be brought to the attention of the average insured. We conclude that the St. Paul policy is ambiguous as to whether it provides coverage for punitive damages.

20. Where punitive damage exclusions lack the clarity required by *Baker*, this Court will construe the contract against the insurer and require coverage of punitive damages, provided that such an interpretation of the contract is in compliance with the probable expectations of the parties. *See Baker*, 106 N.M. at 396–97, 744 P.2d at 171–72; *see also Rummel v. Lexington Ins. Co.*, 1997 NMSC 041 ¶ 22, 123 N.M 752, 945 P.2d 970 (stating that ambiguous terms are given strongest interpretation against insurer reasonable). Where the insurer refutes a presumption in favor of the insured, as St. Paul has attempted to do in this case, the insurer must do so unambiguously, though not necessarily expressly. *Rummel*, 1997 NMSC 041 ¶ 22, 123 N.M. 752, 945 P.2d 970. Given the ambiguity with which St. Paul attempted to exclude punitive damages, we construe the policy in favor of the insured and find that the policy provides coverage for punitive damages.

21. Our determination that the St. Paul policy provides coverage for punitive damages raises a factual question appropriate for resolution by the trial court, pertaining to St. Paul's liability for the unpaid portion of the punitive damages award under the facts of this case. St. Paul points out that its policy provides coverage for judgments in excess of $15,000,000. The policy indemnifies the insured for losses in excess of the underlying insurance limits, which total $15,000,000. The Rummel judgment totalled slightly less than $12,000,000. Thus, according to St. Paul, regardless of whether St. Paul provides coverage for punitive damages, the Rummel judgment was well below the threshold limits of the St. Paul policy. St. Paul concludes that the trial court's grant of summary judgment in its favor was proper.

22. We disagree, finding an ambiguity in the contract provision requiring $15,000,000 of loss prior to coverage by St. Paul. We have determined that the policy does provide coverage for punitive damages. Under St. Paul's interpretation of its contract, Circle K would be responsible for punitive damage awards in excess of the coverage offered by the underlying insurance policies where the compensatory and punitive damages combined did not total $15,000,000. However, once losses totalled at least $15,000,000 St. Paul would step in and take responsibility for punitive and compensatory damages in excess of $15,000,000. It is unlikely that an insured would knowingly adopt a policy which left a gap in coverage for punitive damages. Thus, we conclude that Circle K and St. Paul must have had different understandings of the coverage offered by the St. Paul policy. In light of this ambiguity, we conclude that there is a factual question as to the significance of the provision that there be losses in excess of $15,000,000 as a threshold for St. Paul's liability. The trial court should now consider the facts and circumstances surrounding the formation of the contract in order to determine the true intent of the contracting parties and to assign the proper meaning to that term. *See Mark V*, 114 N.M. at 781, 845 P.2d at 1235. Once the significance of the ambiguous provision has been determined, the trial court can proceed to evaluate whether the $15,000.000 loss provision insulates St. Paul from liability for the remainder of Rummel's punitive damages award.

## III.

23. The district court properly granted Harbor partial summary judgment because the Harbor insurance policy unambiguously excludes coverage of punitive damages, effectively relieving Harbor of any liability for the punitive damages portion of the judgment. The district court erred in granting St. Paul partial summary judgment because the St. Paul insurance policy failed to effectively exclude punitive damages and a question remains as to whether St. Paul is liable for any portion of Rummel's punitive damages award. Thus, a trial on the merits is neces-

sary to determine whether the provision requiring $15,000,000 of loss in order to activate the St. Paul policy actually insulates St. Paul from liability for this judgment.

24. IT IS SO ORDERED.

MINZNER and McKINNON, JJ., concur.

