This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**LENSCRAFTERS, INC.,**
**an Ohio Corporation,**

     Plaintiff-Appellee/Cross-Appellant,

v.                                               **NO. 28,145**

**DENNIS KEHOE, O. D.,**

     Defendant-Appellant/Cross-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Richard J. Knowles, District Judge**

Montgomery & Andrews, P. A.
Randy E. Bartell
Santa Fe, NM

John S. Schmidt, III
Melissa J. Copeland
Williams Mullen
Raleigh, NC

for Appellee

Bauman, Dow & Leon, P. C.
Mark C. Dow
John Michael Hughson
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Judge.**

Dennis Kehoe, O.D., appeals from the district court's grant of summary judgment on his counterclaims in favor of LensCrafters, Inc. LensCrafters cross-appeals from the district court's grant of summary judgment in favor of Kehoe regarding its claim to enforce the non-competition provision in the parties' sublease agreement. We affirm the district court's summary judgment in favor of LensCrafters on Kehoe's counterclaim. We reverse the court's summary judgment in favor of Kehoe on LensCrafters' claim.

**BACKGROUND**

In 1997 Kehoe, an optometrist, leased space from LensCrafters next to their retail store at Winrock Center in Albuquerque, New Mexico. The parties entered into an initial sublease agreement and continued their relationship through successive sublease agreements until 2001 when their relationship ended. On October 5, 2001, after leaving LensCrafters, Kehoe subleased space next to Pearle Vision (Pearle) at Coronado Center less than a mile from Winrock. On October 12, 2001, LensCrafters sued to enforce the non-competition provision in the parties' sublease agreement. In December 2001, Kehoe filed counterclaims for (1) breach of indemnity and defense agreement, (2) bad faith failure to indemnify and defend, (3) bad faith breach of

contract, (4) negligence and negligent misrepresentation, (5) tortious interference with business relations, (6) violation of the New Mexico Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2009), (7) abuse of process, and (8) restraint of trade.

Kehoe moved for partial summary judgment on LensCrafters' breach of contract claim. On July 8, 2003, the district court granted Kehoe's motion, ruling that the sublease agreement was terminated by a letter that LensCrafters sent to Kehoe on May 29, 2001. We refer to this May 29, 2001, letter as "the May 2001 letter." In May and July 2006, five years after the commencement of litigation, Kehoe filed a motion to amend counterclaims and an amended motion to supplement counterclaims. The district court denied Kehoe's amended motion to supplement counterclaims. Several months later, LensCrafters moved for summary judgment on all of Kehoe's counterclaims. In October 2007, the district court dismissed all of Kehoe's counterclaims. These appeals followed.

**DISCUSSION**

**I.    Summary Judgment Motions**

**Standard of Review**

We review the grant of summary judgment de novo. *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "Summary judgment

is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* "The movant need only make a prima facie showing that he is entitled to summary judgment. Upon the movant making a prima facie showing, the burden shifts to the party opposing the motion to demonstrate the existence of specific evidentiary facts [that] would require trial on the merits." *Roth v. Thompson*, 113 N.M. 331, 334-35, 825 P.2d 1241, 1244-45 (1992) (citation omitted); *see Fikes v. Furst*, 2003-NMSC-033, ¶ 11, 134 N.M. 602, 81 P.3d 545 (stating that once the movant "makes a prima facie case that summary judgment should be granted, the burden shifts to the opponent to show at least a reasonable doubt, rather than a slight doubt, as to the existence of a genuine issue of fact" (internal quotation marks and citation omitted)). We favor resolution on the merits, and, therefore, we view "the evidence in the light most favorable to the party opposing a summary judgment motion and draw[] all inferences in favor of a trial on the merits." *Spencer v. Health Force, Inc.*, 2005-NMSC-002, ¶ 24, 137 N.M. 64, 107 P.3d 504.

**A.    LensCrafters' Claim for Breach of Contract**

The district court granted Kehoe's motion for summary judgment, stating that the May 2001 letter "terminated the 1999 [s]ublease [a]greement, superceding any notice given by [Kehoe] and extinguishing any claim LensCrafters may have had to

4

enforce the covenants not to compete." The question before us is whether the district court erred in determining that there were no genuine issues of material fact. The pivotal issue is whether the May 2001 letter was a termination letter or an offer to renew the sublease. LensCrafters asserts that genuine issues of material fact preclude summary judgment because the letter was an offer to renew and not a termination letter as Kehoe argued and the court held. We conclude that the letter was ambiguous and summary judgment was not properly granted because a genuine issue of material fact existed as to whether the letter terminated the sublease agreement or merely constituted an offer to renew.

The contract dispute is essentially over whether the non-compete provision in the sublease agreement continued to be enforceable against Kehoe. In reviewing the parties' actions regarding the sublease agreement that culminated with the May 2001 letter, our primary goal is "to ascertain and give effect to the intentions of the parties." *Manuel Lujan Ins., Inc. v. Jordan*, 100 N.M. 573, 575, 673 P.2d 1306, 1308 (1983). We are to define the rights of each party under the terms of their contract and then determine de novo whether there was ambiguity regarding the exercise of those rights. *Rummel v. St. Paul Surplus Lines Ins. Co.*, 1997-NMSC-042, ¶ 10, 123 N.M. 767, 945 P.2d 985. "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d

1232, 1235 (1993); *see Rummel*, 1997-NMSC-042, ¶ 10 ("Ambiguity is present where a contract can reasonably and fairly be subject to several different interpretations."). In evaluating whether an ambiguity exists, we consider the language of the document, as well as extrinsic evidence. *Rummel*, 1997-NMSC-042, ¶ 10.

The enforcement of the non-competition provision depended upon whether the 1999 sublease agreement, which was extended by the parties another year through 2000, was terminated by LensCrafters' May 2001 letter, or whether it was Kehoe who chose not to renew the sublease agreement and therefore terminated the sublease agreement in June 2001. The applicable non-competition provision under Section 17C of the 1999 and 2000 sublease agreements states as follows:

> (1) If this Sublease Agreement terminates because of Doctor's default or Doctor's election not to renew under Section 2C of this Sublease Agreement . . . for one year after this Sublease Agreement terminates Doctor shall [not compete with LensCrafters within a ten-mile radius of the Winrock Center location].

Section 2C of the sublease agreements states:

> (1) Provided that Doctor is not in default under this or any other written agreement with LensCrafters, this Sublease Agreement shall be renewed for successive three (3) year terms if Doctor gives LensCrafters written notice at least 120 days prior to the end of the then current term of Doctor's intent to renew; provided, however, such notice shall be superseded if LensCrafters notifies Doctor in writing at least 120 days prior to the end of such term of its intention to terminate this Sublease Agreement at the end of the

term. In the event of such notice from LensCrafters, the Sublease Agreement shall terminate at the end of the term.

(2) Any renewal shall be on LensCrafters' then current form or term of sublease agreement which must be executed by Doctor not less than [sixty] days prior to the end of the expiring term or Doctor will be deemed to have elected not to renew under this Section.

The May 2001 letter accompanying the proposed sublease agreement stated in part:

LensCrafters is offering you a renewal under its new current form of Sublease Agreement. According to our records, the term for your Winrock Center, Albuquerque, NM location expires September 30, 2001. This letter serves as notice of non-renewal of the Sublease Agreement dated October 1, 1999. However, as already mentioned, LensCrafters is offering its new standard Sublease Agreement if you wish to continue the subleasing relationship.

If you wish to continue your relationship with us, please review and sign each of the enclosed Sublease Agreements and this letter, where appropriate.... After signature by our corporate representatives, we will return an executed Sublease Agreement to you for your records.

. . . .

ACKNOWLEDGMENT
I acknowledge the September 30, 2001, termination of the Sublease Agreement dated October 1, 1999, by and between Dennis Kehoe, O.D. and LensCrafters, Inc.

_____
Dennis Kehoe, O.D.

The district court determined that the May 2001 letter from LensCrafters terminated the existing sublease agreement under Section 2C(1) and, thus, prevented

and superseded any subsequent effort by Kehoe to exercise his intent to renew the sublease. LensCrafters argues that the district court erred in its conclusion because at the very least there exist genuine issues of material fact as to the purpose and effect of the letter, arguing that Kehoe knew that LensCrafters "intended to offer him a renewal" based on the language of the letter and on the parties' prior course of dealings.

In 1997 the parties entered their first sublease agreement. Before the expiration of the sublease in 1998, LensCrafters sent Kehoe a letter that stated in part:

> LensCrafters is offering you a renewal under its new current form of Sublease Agreement. According to our records, the term for your Winrock Center, Albuquerque, NM location expires September 30, 1998. This letter serves as notice of non-renewal of the Sublease Agreement dated August 4, 1997. However, as already mentioned, LensCrafters is offering its new standard Sublease Agreement if you wish to continue the subleasing relationship.
>
> If you wish to continue your relationship with us, please review and sign each of the enclosed Sublease Agreements and this letter, where appropriate.... After signature by our corporate representatives, we will return an executed Sublease Agreement to you for your records.

At the end of this 1998 letter was an acknowledgment that stated: "I acknowledge the termination of the Sublease Agreement dated August 4, 1997, by and between Dennis Kehoe, O.D. and LensCrafters, Inc." Kehoe signed the acknowledgment and also signed the new one-year sublease agreement that was LensCrafters' then-current form or term of sublease agreement as required in Section 2C(2) of the agreement.

In 1999 LensCrafters sent an almost identical letter to Kehoe. Again, Kehoe signed the acknowledgment of the termination of the previous sublease agreement and also signed a new one-year sublease agreement on LensCrafters' then-current form or term of sublease agreement.

In 2000 LensCrafters sent Kehoe a different letter, stating:

> **This is to confirm the Sublease Agreement**, as amended, between LensCrafters, Inc. and Dennis Kehoe, O.D. dated October 1, 1999, as it pertains to the Winrock Center, Albuquerque, NM location, will be renewed October 1, 2000. The expiration date will then be September 30, 2001.
>
> . . . .
>
> Please sign the acknowledgment below indicating your agreement to renew the Sublease Agreement dated October 1, 2000, and return a signed copy.

Kehoe signed the acknowledgment.

The issue before us is whether the May 2001 letter sent by LensCrafters to Kehoe created ambiguity regarding the contractual relationship of the parties taking into consideration the previous course and dealings in 1998, 1999, and 2000. The May 2001 letter was almost identical to the letters in 1998 and 1999 in that it stated it was a notice of non-renewal of the existing sublease agreement and that it was making an offer of a new sublease agreement if Kehoe wished "to continue the subleasing relationship" with LensCrafters. As in 1998 and 1999, LensCrafters

9

attached the "new" sublease agreement to the May 2001 letter for Kehoe to sign if he desired to enter into a new lease with LensCrafters. Also consistent with the 1998 and 1999 letters, there was an acknowledgment provision for Kehoe to sign confirming that he understood that the May 2001 letter served as a termination of the 1999 sublease agreement.

The only substantive difference between what occurred in 1998 and 1999, and that which occurred in 2001, was that Kehoe decided not to sign a new 2001 sublease agreement. The 2000 transaction differed from those in 1998, 1999, and 2001, in that it by-passed the offer to renew/acknowledgment of termination provisions and process in the 1998, 1999, and 2001 letters, using instead a form of agreement to renew by using the existing lease form instead of a new sublease form.

LensCrafters argues that the May 2001 letter was an offer to renew or else terminate, no different than in 1998 and 1999 and that the past transactions as well as Kehoe's response to its May 2001 letter show that the parties knew the May 2001 letter was a renewal letter. Kehoe sent LensCrafters a letter dated June 30, 2001, stating that he was notifying LensCrafters that he was not going to renew his sublease agreement. LensCrafters also shows that the word "terminate" did not appear in the body of the May 2001 letter. LensCrafters argues that it intended its May 2001 letter to be an offer to renew.

The foregoing recitation of the circumstances is nothing less than a presentation of fact and argument that can be interpreted and decided either as a mere offer by LensCrafters to renew the sublease agreement using its current form or term, as in the past, and as argued by LensCrafters, or as a termination by LensCrafters, as argued by Kehoe and determined by the district court. If the May 2001 letter was an offer to renew and not a termination by LensCrafters, the non-compete provision in the sublease agreement remained viable. If that letter was a termination of the sublease by LensCrafters, the non-compete provision no longer remained viable. The district court viewed the circumstances as a termination of the sublease agreement by LensCrafters. However, in the 1998 and 1999 dealings, letters with the same language as the May 2001 letter were treated as offers to renew the sublease agreement which were accepted by Kehoe and Kehoe signed LensCrafters' then-current form or term of sublease. Kehoe's June 30, 2001, statement that he would not be renewing the sublease agreement could be construed as an acknowledgment that the May 2001 letter was indeed an offer to renew using LensCrafters' current form or term, thus creating a genuine issue of material fact for the trier of fact.

After reviewing the evidence in the light most favorable to LensCrafters, we disagree with the district court that no material issues of fact exist as to whether LensCrafters terminated the parties' sublease agreement or whether the May 2001

11

letter instead was an offer to renew on LensCrafters' then-current form or term of sublease agreement that was not accepted by Kehoe. Consequently, we reverse the district court on this issue.

**B.     Kehoe's Claims on Appeal**

Kehoe challenges the district court's grant of LensCrafters' motion for summary judgment on all of his claims. Kehoe presents numerous arguments on appeal to support his claims. LensCrafters challenges several of Kehoe's arguments based on lack of preservation. We take this opportunity to remind Kehoe that he must preserve his arguments below and that he cannot raise issues for the first time on appeal. *See* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked[.]"). In addition, it is Kehoe's responsibility to show this Court where his arguments have been preserved in the record. *Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273 (filed 2004) ("[O]n appeal, the party must specifically point out where, in the record, the party invoked the court's ruling on the issue."). We will not search the record for arguments made below or otherwise address arguments on appeal that have not been preserved. *Id.* ("Absent [a] citation to the record or any obvious preservation, we will not consider the issue.").

**Malicious Abuse of Process Claim**

12

Our Supreme Court in *Durham v. Guest*, 2009-NMSC-007, ¶ 29, 145 N.M. 694, 204 P.3d 19, recently identified the elements of the tort of malicious abuse of process as follow: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." The Court further explained that "[a]n improper use of process may be shown by . . . filing a complaint without probable cause[.]" *Id.* Probable cause is "the reasonable belief, founded on known facts established after a reasonable pre-filing investigation . . . that a claim can be established to the satisfaction of a court or jury." *DeVaney v. Thriftway Mktg. Corp.*, 1998-NMSC-001, ¶ 22, 124 N.M. 512, 953 P.2d 277 (filed 1997) (footnote omitted), *overruled on other grounds by Durham*, 2009-NMSC-007, ¶ 36. We understand Kehoe's argument to be that LensCrafters lacked probable cause to file its claim for breach of contract based on the non-competition provision of the sublease agreement.

LensCrafters established a prima facie case that it had probable cause to assert a claim against Kehoe for breach of contract. LensCrafters interpreted Kehoe's June 30, 2001, letter as a non-renewal letter triggering the non-competition clause. The letter did specifically state, "This letter is to notify you that I will not be renewing my sublease with LensCrafters." Consistent with its interpretation of the June 30 letter,

13

LensCrafters sent Kehoe a cease and desist letter based on the non-competition clause. LensCrafters' interactions may have been misplaced as a result of Kehoe's June 30 letter, but the resulting confusion can be partially attributed to Kehoe. Given the policy of New Mexico courts to encourage free use of the judicial system, LensCrafters established that it was not unreasonable in its belief that it had a viable breach of contract claim that could survive in court. *See Durham*, 2009-NMSC-007, ¶ 29; *DeVaney*, 1998-NMSC-001, ¶ 19.

Having established a confusing factual situation that could reasonably be interpreted to set out a prima facie case in support of probable cause, the burden on summary judgment then shifted to Kehoe to establish material issues of fact that would preclude judgment as a matter of law. *See Roth v. Thompson*, 113 N.M. 331, 334-35, 825 P.2d 1241, 1244-45 (1992) (explaining that when the movant makes a prima facie showing, "the burden shifts to the party opposing the motion to demonstrate the existence of specific evidentiary facts which would require trial on the merits"). This Kehoe failed to do. The sublease agreement itself arguably supports LensCrafters' failed claim due to the mistaken notice sent by Kehoe in his June 30 letter. In addition, Kehoe presented no evidence that LensCrafters' belief in the validity of its claim under the non-competition clause was manifestly unreasonable. *Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007-NMSC-047, ¶ 13,

142 N.M. 150, 164 P.3d 31 (stating that the lack of a reasonable belief for determining probable cause, as an element of malicious abuse of process, "must be manifest" (internal quotation marks and citation omitted)).

Kehoe makes other arguments on appeal regarding this claim. First, LensCrafters' conduct in negotiating the new sublease agreement in 2001 was a repudiation of the previous contract, thus negating probable cause to enforce the non-competition clause. Second, LensCrafters' statements regarding the non-competition provision constituted waiver by estoppel that negated probable cause. LensCrafters asserts that these arguments were not preserved below. We agree. Kehoe fails to explain in his brief in chief or in his reply brief where these arguments were preserved. As a result, we decline to search the record in order to address these arguments. *See Crutchfield*, 2005-NMCA-022, ¶ 14.

**Tortious Interference Claim**

Kehoe argues on appeal that there are genuine issues of material fact that preclude summary judgment on his tortious interference claim. The elements of the tort generally are (1) a contractual or prospective contractual relationship, (2) the defendant's knowledge of the contractual relationship, (3) intentional and improper interference with the relationship, and (4) damages based on the interference. *See Zarr v. Wash. Tru Solutions, LLC*, 2009-NMCA-050, ¶¶ 6-7, 146 N.M. 274, 208 P.3d

15

919. Although the argument is not entirely clear, it seems that Kehoe is generally alleging that his claim should survive summary judgment because LensCrafters brought a meritless suit against him and because LensCrafters threatened that if he did not drop his lawsuit, Pearle would not continue its business relationship with him. The first ground for Kehoe's argument fails because we have already decided that LensCrafters' suit was not meritless due to the confusion raised by Kehoe's June 2001 letter.

In his response to LensCrafters' motion for summary judgment, Kehoe argues that Dave Reaves and Denver Kramer threatened him. Dave Reaves worked for LensCrafters before he transferred to Pearle after Luxottica bought Pearle. Reaves was Kramer's supervisor at Pearle. At the time of the threats, both Reaves and Kramer worked for Pearle. Kehoe, nevertheless, relies on Reaves' former employment with LensCrafters to argue that "LensCrafters interfered and induced Pearle Vision not to renew its lease" with him. Kehoe's argument is incorrect because it was Pearle's managers and not LensCrafters' managers who threatened him. The district court recognized the illogic of Kehoe's argument at the hearing on LensCrafters' motion for summary judgment and, consequently, awarded summary judgment for LensCrafters.

Although he did not argue the evidence in his response to LensCrafters' motion for summary judgment or at the hearing on the motion for summary judgment, Kehoe in his brief, directs this Court to evidence in the record that LensCrafters' attorney threatened him with closing his business. The evidence in the record is a letter from Kehoe's attorney to LensCrafters' attorney, Randy Bartell, alleging that Bartell had confirmed LensCrafters' threat to shut down Kehoe's business. This letter was attached to Kehoe's motion for a continuance to file his new motions to amend his complaint for tortious interference. The district court never ruled on Kehoe's motion. Factually, Lenscrafters was attempting to legally shut down Kehoe's business at its new location by pursuing the enforcement of the non-competition provision in this lawsuit. This assertion by LensCrafters was the claim for relief it had filed against Kehoe, but this claim ultimately failed when the district court granted summary judgment on this non-competition issue. This statement of intent during the litigation of the non-competition provision, however, was nothing more than a declaration of one party's intention to enforce its legal rights. Kehoe has failed to provide us with any authority that supports his argument that LensCrafters' attempt to pursue its unsuccessful legal claim regarding the parties' sublease can become the factual basis for a separate new tortious interference claim. *See ITT Educ. Servs., Inc. v. Taxation*

17

*& Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (stating that this Court will not consider propositions that are unsupported).

In addition, Kehoe presented no evidence that LensCrafters caused Pearle not to contract with Kehoe. Kehoe's sublease agreement with Pearle expired on its own terms. Prior to the expiration of the agreement, Pearle offered Kehoe a new sublease agreement. It was Kehoe who rejected Pearle's new sublease agreement offer and relocated. We agree with LensCrafters that Kehoe presented no evidence to support his claim that LensCrafters' alleged actions resulted in tortious interference with his patients or Pearle. *See Blauwkamp v. Univ. of N.M. Hosp.*, 114 N.M. 228, 232, 836 P.2d 1249, 1253 (Ct. App. 1992) (explaining that a prima facie case supporting summary judgment may be established without affidavits if, through discovery, it appears that the party opposing summary judgment cannot factually establish an essential element of his or her case). We do not discount Kehoe's arguments regarding the treatment he received as his relationship with LensCrafters deteriorated. However, we have no record before us on which we can overturn the district court's grant of summary judgment in LensCrafters' favor on the tortious interference claim. We affirm the district court on this issue.

18

**Civil Conspiracy Claim**

Kehoe argues that the district court erroneously granted summary judgment on his conspiracy claim. LensCrafters responds that Kehoe never pled this claim below. Kehoe did not explain in his reply brief where he pled this claim or how his arguments were preserved. Furthermore, a civil conspiracy claim only survives if the underlying tortious interference claim survives. *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 16, 139 N.M. 637, 137 P.3d 577. We therefore affirm the district court on this issue.

**Unfair Practices Act Claim**

Kehoe argues that LensCrafters' actions violated the UPA. LensCrafters responds that the UPA does not apply to this case because the sublease agreement pertained to real property and not goods and services.

Under Section 57-12-3, "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." "[U]nfair or deceptive trade practice" involves "an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services[.]" § 57-12-2(D) (internal quotation marks omitted). Pursuant to this definition, the UPA applies only to goods and services and not to the rental of real property such as office space. *See*

19

*McElhannon v. Ford*, 2003-NMCA-091, ¶¶ 16-17, 134 N.M. 124, 73 P.3d 827; *see also Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 2005-NMCA-051, ¶ 14, 137 N.M. 524, 113 P.3d 347 (stating that "the UPA contemplates a plaintiff who seeks or acquires goods or services and a defendant who provides goods or services").

Kehoe argued below and continues to argue on appeal that the UPA applies because the 2000 renewal was a "lease of equipment" in addition to the lease of office space. The "grant" subsection of the sublease agreement contained two statements. The second statement identifies that "LensCrafters leases the Equipment and all or any additional Equipment added at a later date to Doctor pursuant to the terms of this Sublease Agreement." Based on the language in this section, it is possible that the UPA could apply because LensCrafters did lease equipment and not just property to Kehoe. However, even if we were to agree that the UPA applies, Kehoe's claim under the UPA fails because he did not present material evidence that LensCrafters violated the UPA. *See Blauwkamp*, 114 N.M. at 232, 836 P.2d at 1253 (explaining that a party may establish a prima facie case supporting summary judgment without affidavits if, through discovery, it appears that the party opposing summary judgment cannot factually establish an essential element of his or her case).

20

Kehoe presents two arguments in his effort to establish that LensCrafters violated the UPA. First, he argues that the record establishes that LensCrafters unlawfully induced him into signing the sublease agreement by assuring him that LensCrafters would not enforce the non-competition provision. However, Kehoe does not direct us to any evidence in the record to support his allegation that at the time of forming the sublease agreement, LensCrafters intended to mislead him. *See Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 100, 811 P.2d 1308, 1311 (1991) (stating that under the UPA a misrepresentation must be knowingly made).

Second, Kehoe argues that LensCrafters' effort to exorbitantly increase the rent was unconscionable. *See* § 57-12-2(E) ("'[U]nconscionable trade practice' means an act or practice . . . to a person's detriment [that] (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid."). Again, Kehoe fails to direct us to evidence in the record regarding the equipment that would support this argument. It is undisputed that the sublease agreement specifically allowed for a $12,000 per year increase in rent. Kehoe presented no evidence to evaluate the equipment portion of the sublease agreement or any apportionment of the overall lease to the equipment. He fails to demonstrate that he was taken advantage of to a grossly unfair degree or that there was a gross disparity

21

in value between what he was paying in rent and what he received under the equipment portion of the agreement. *See id.*

Finally, Kehoe appears to make an equal protection argument with regard to the hybrid nature of the lease. Kehoe does not explain how this argument was preserved below. We therefore affirm the district court's grant of LensCrafters' motion for summary judgment on this issue.

**Breach of Implied Covenant of Good Faith and Fair Dealing Claim**

Kehoe argues that LensCrafters breached the implied covenant of good faith and fair dealing that is implicit in every contract. Kehoe argues that LensCrafters breached this covenant by attempting to raise his rent by $12,000 per year and then by suing him after LensCrafters had repudiated their contract. We agree with LensCrafters that the express terms of the sublease agreement allowed LensCrafters to raise Kehoe's rent by $1,000 per month and to enforce the non-competition clause upon non-renewal. We affirm the district court on this issue since LensCrafters' actions were not outside of the express terms of the sublease agreement and, therefore, did not constitute bad faith. *See Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 49, 133 N.M. 669, 68 P.3d 909 (stating that courts do not apply the doctrine of implied covenant of good faith and fair dealing to override express provisions

addressed by the terms of a written contract); *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 438, 872 P.2d 852, 856 (1994) (same).

**Restraint on Trade Claim**

Kehoe does not articulate his argument on the restraint of trade claim except to assert that LensCrafters' interference with his move to Coronado Center was a fact question regarding restraint of trade that was for the jury. We presume that Kehoe is basing this claim on the alleged conspiracy between LensCrafters and Pearle. As stated previously, Kehoe has not demonstrated that any alleged conspiracy between LensCrafters and Pearle affected his relationship or ability to do business with Pearle and his patients. *See* NMSA 1978, § 57-1-1 (1987) (stating that it is unlawful to conspire in restraint of trade); *Clough*, 108 N.M. at 804, 780 P.2d at 630 (stating that to establish a restraint of trade violation, a plaintiff must prove both a conspiracy and an unreasonable restraint of trade due to the conspiracy).

To the extent Kehoe is arguing that LensCrafters restrained his ability to trade by suing him to enforce the non-competition provision, we also reject this argument. LensCrafters' attempt to enforce the non-competition provision was not unlawful. *See Bowen v. Carlsbad Ins. & Real Estate, Inc.*, 104 N.M. 514, 516-17, 724 P.2d 223, 225-26 (1986) (holding that a restrictive covenant was not void as a restraint of trade because it was "limited as to time and space and [was] subsidiary to the main purpose

23

of disposing of an established business"); *Thomas v. Gavin*, 15 N.M. 660, 663, 110 P. 841, 842 (1910) (stating the well-settled law "that an agreement to refrain from engaging in a certain business within reasonable limits of time and place is valid if it is made as subsidiary to the main purpose of disposing of property employed in that business on better terms than could be obtained without such an agreement"). We affirm the district court on this issue.

**Failure to Defend and Associated Bad Faith Claim**

We interpret Kehoe's argument to be that LensCrafters should have defended and indemnified him in the suit that LensCrafters filed against him. Kehoe appears to argue that the indemnification clause in the sublease agreement covered *all* suits against him, including suits initiated by LensCrafters under the sublease agreement. LensCrafters argues that the clause was not applicable to these circumstances. The district court agreed with LensCrafters and found the indemnity provision did not apply to these circumstances. We affirm the district court.

We apply general principles of contract law and indemnification law in analyzing Kehoe's argument. "The central objective in construing a contract is to ascertain and give effect to the intentions of the parties." *Manuel Lujan Ins., Inc.*, 100 N.M. at 575, 673 P.2d at 1308. In determining the intent of the parties, the district court "may hear evidence of the circumstances surrounding the making of the contract

24

and of any relevant usage of trade, course of dealing, and course of performance, in order to decide whether the meaning of a term or expression contained in the agreement is actually unclear." *Mark V, Inc.*, 114 N.M. at 781, 845 P.2d at 1235 (internal quotation marks and citation omitted). If the evidence is so clear that the contract lends itself to one interpretation, the court can rule as a matter of law. *C.R. Anthony Co.*, 112 N.M. at 510, 817 P.2d at 244. The district court may employ standard contract principles to help in its analysis. *Id.* at 511 n.5, 817 P.2d at 245 n.5. On appeal, we review the court's interpretation of the law de novo and pertinent factual determinations for substantial evidence. *See id.* at 509-10, 817 P.2d at 243-44.

The indemnification provision in question stated that each party shall indemnify and defend the other party from "any claims . . . for injuries, illnesses or death to persons or for loss of or damage to property caused by the sole negligence or willful misconduct" of the responsible party. Kehoe argues that the term "any" is not qualified and, therefore, means that the clause covers all lawsuits, including LensCrafters' lawsuit against him to enforce the non-competition provision. Kehoe further contends that "injuries" somehow includes the harm done to him via the non-renewal of his sublease agreement. The district court determined that under the clear language of the provision, LensCrafters had no duty to indemnify and defend Kehoe under these circumstances because the provision deemed each party responsible for

damage that it caused to a third party. The court further determined that the provision was not invoked because Kehoe was not injured by an act of negligence or willful misconduct. We agree with the district court.

Traditional indemnification involves three parties. *See N.M. Pub. Sch. Ins. Auth. v. Arthur J. Gallagher & Co.*, 2008-NMSC-067, ¶ 25, 145 N.M. 316, 198 P.3d 342 (stating that a requirement under traditional indemnification "is that both the indemnitee and the indemnitor must be liable to the injured party"). "Traditional indemnification grants the person who has been held liable for another's wrongdoing an all-or-nothing right of recovery from a third party, such as the primary wrongdoer." *Id.* ¶ 23. A plain reading of the indemnification clause in this case indicates that LensCrafters and Kehoe intended to contractualize traditional indemnification principles and not their own first-party liability to each other under the contract. Thus, each party would indemnify the other against "any and all" suits from third parties who qualified under the reciprocal indemnity provision. If the parties wished to indemnify each other against their own negligence and willful misconduct, the language in their agreement must explicitly have stated such intent. *See Krieger v. Wilson Corp.*, 2006-NMCA-034, ¶ 18, 139 N.M. 274, 131 P.3d 661 (filed 2005) (stating that absolute indemnity must be demonstrated with clear and unequivocal intent by the parties). No such intent was expressed in the sublease agreement.

26

Instead, the indemnity clauses and the separate "enforceability" clause in the agreement demonstrate just the opposite. The enforceability clause stated that if LensCrafters or Kehoe "find it necessary to enforce any part of [the sublease agreement] through arbitration or legal proceeding, . . . each party shall pay all of their own costs and attorneys' fees incurred for such purpose." Considering all of the sublease agreement provisions together, it is clear that the parties intended to indemnify and defend each other against third-party claims and to pay their own costs and fees when enforcing contract claims against each other. *See Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 19, 131 N.M. 100, 33 P.3d 651 ("[W]e view the contract as a harmonious whole, give meaning to every provision, and accord each part of the contract its significance in light of other provisions."); *see also Mayfield Smithson Enters. v. Com-Quip, Inc.*, 120 N.M. 9, 14, 896 P.2d 1156, 1161 (1995) (declining to interpret a contract in a manner that would render portions of the contract pointless).

Next, we agree with the district court that Kehoe's claim does not qualify for indemnification based on his alleged injury and LensCrafters' actions. Kehoe has not demonstrated that the non-renewal of the sublease agreement was an "injury" under the indemnity provision. LensCrafters was under no obligation to offer Kehoe a continued sublease agreement. Furthermore, Kehoe's alleged injury could not have

27

been caused by LensCrafters' negligence or wilful misconduct because LensCrafters was acting lawfully when pursuing its breach of contract claim against Kehoe.

Finally, to interpret the sublease agreement as Kehoe suggests would create an absurd result. *See Estate of Griego ex rel. Griego v. Reliance Standard Life Ins. Co.*, 2000-NMCA-022, ¶ 19, 128 N.M. 676, 997 P.2d 150 (stating that courts avoid enforcing language in contracts that would lead to absurd results). LensCrafters would have to pay to defend the opposing party in this lawsuit, thereby eliminating any incentive to bring a legitimate breach of contract claim in the first place and depriving LensCrafters access to the court system. Recognizing such an obligation to defend Kehoe against itself would create an irreconcilable conflict of interest for LensCrafters. Finally, indemnification would require LensCrafters to pay itself any damages resulting from Kehoe's breach of the sublease agreement, thereby defeating the purpose of any award of damages. Such an absurd result would require clear and unequivocal language expressly stated in the parties' contract, patently absent in this case.

Kehoe twice tried to convince the district court that the indemnification clause applied to first-party claims involving just LensCrafters and Kehoe, and the district court found Kehoe's arguments lacked any merit. Reading the plain language of the indemnification provision and reading the sublease agreement as a whole, with the

28

principles of traditional indemnification in mind, we conclude that the indemnification clause does not apply when LensCrafters is suing Kehoe to enforce the provisions of the sublease agreement.

**II.     Kehoe's Motion to Amend Counterclaim**

Although this argument is unclear, Kehoe appears to argue on appeal that he should have been given leave to amend his counterclaim to include additional grounds for the tortious interference claim and a new claim for civil conspiracy. Rule 1-015(A) NMRA allows for a party to amend a pleading with permission from the court, further stating that "leave shall be freely given when justice so requires." The district court has discretion to allow a party to file an amended complaint pursuant to Rule 1-015(A), and we review the court's decision for an abuse of that discretion. *Matrix Prod. Co. v. Ricks Exploration, Inc.*, 2004-NMCA-135, ¶ 21, 136 N.M. 593, 102 P.3d 1285. "[A]n abuse of discretion is said to occur when the court exceeds the bounds of reason, all the circumstances before it being considered." *Id.* (alteration in original) (internal quotation marks and citation omitted).

Kehoe's motion was based on LensCrafters' alleged statement to Kehoe that if he wanted a new sublease with Pearle, he must drop his existing lawsuit against LensCrafters. The district court denied Kehoe's motion because the proposed amended counterclaim failed to state a claim based on LensCrafters' actions. Kehoe

29

has failed on appeal to demonstrate that the district court abused its discretion in denying the motion to amend or supplement. As discussed at length, Kehoe's contract with Pearle expired on its own terms based on Pearle's move from Coronado Center. Kehoe had to relocate his practice regardless of whether he continued with Pearle. Pearle further offered Kehoe the opportunity to continue working with Pearle at the new location, and Kehoe declined this offer.

The district court thoroughly reviewed Kehoe's request and held a lengthy motions hearing where Kehoe was encouraged to establish the basis for his new claims. In addition to Kehoe's failure to prove the validity of his claims, it was possible that the claims based on LensCrafters' actions could have been brought in a separate action. *See Alliance Health of Santa Teresa, Inc. v. Nat'l Presto Indus., Inc.*, 2007-NMCA-157, ¶ 26, 143 N.M. 133, 173 P.3d 55 (holding that the trial court did not abuse its discretion in denying the motion to amend when granting the amendment would have been futile). Finally, Kehoe's motions to amend or supplement were brought just months before trial and would have required new counsel to step into a case that had been in litigation for five years. Given the circumstances of the case, we conclude that the district court did not abuse its discretion in denying Kehoe's motions to amend his counterclaim. *See, e.g.*, *Rivera v. King*, 108 N.M. 5, 9, 765 P.2d 1187, 1191 (Ct. App. 1988) (holding no abuse of discretion in denying motion to amend

30

when motion was made five years after the original complaint, hearing on motion was held one month before trial, and party failed to explain how she was prejudiced by the denial).

**CONCLUSION**

We affirm the district court's summary judgment in favor of LensCrafters on Kehoe's counterclaim. We reverse the court's summary judgment in favor of Kehoe on LensCrafters' claim and remand for further proceedings with regard to LensCrafters' claim.

**IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**I CONCUR:**

_____
**CYNTHIA A. FRY, Chief Judge**

**TIMOTHY L. GARCIA, Judge (concurring in part and dissenting in part).**

**GARCIA, Judge (concurring in part, dissenting in part).**

I respectfully disagree with the majority regarding the reversal of the district court's summary judgment ruling in favor of Kehoe on the breach of contract claim. The undisputed facts establish that LensCrafters did not have any contractual right to "renew" the existing sublease agreement. Kehoe possessed the only contractual right to renew the existing sublease agreement, and this right was limited by the terms of the parties' contract. Kehoe's right to renew was limited to a specific time period and was also subject to a superceding right by LensCrafters to terminate the parties' existing sublease agreement and reject any attempted renewal presented by Kehoe. In addition, the parties' prior course of dealings did not raise a material issue of fact regarding the establishment of any additional rights in favor of LensCrafters to effectuate a renewal of the existing sublease agreement at the same time it exercised its right to terminate the sublease agreement. As a result, I would affirm the district court's summary judgment ruling in favor of Kehoe.

The resolution of this contractual issue is primarily factual and not legal. LensCrafters asserts that there are material issues of fact regarding whether the May 2001 letter was an offer from LensCrafters to renew the parties' existing sublease agreement. This assertion is only relevant to the parties' contract if LensCrafters was legally entitled to simultaneously effectuate a renewal of the existing sublease

agreement at the same time it was notifying Kehoe of a formal termination of the sublease agreement. If no such legal right existed in favor of LensCrafters pursuant the parties' contract, then LensCrafters' argument is irrelevant regarding whether the May 2001 letter establishes material issues of fact related to its intention to offer to renew the existing sublease agreement. In fact, no such legal right existed under the parties' sublease agreement, and LensCrafters cannot create a new provision in the parties' contract by contending that it unilaterally expressed such an intention in its May 2001 letter. *See Wendenburg v. Allen Roofing Co.*, 104 N.M. 231, 233, 719 P.2d 809, 811 (1986) (agreeing that the "terms of contract cannot be changed unilaterally by one party"). "Moreover, mere argument or bare contentions of the existence of a material issue of fact is insufficient." *Clough v. Adventist Health Sys., Inc.*, 108 N.M. 801, 803, 780 P.2d 627, 629 (1989).

The majority has erred in its analysis by determining that, as a result of the parties' prior course of dealings in 1998, 1999, and 2000, LensCrafters may have established a contractual right to effectuate a potential renewal of the existing sublease agreement at the same time it terminated the sublease agreement in its May 2001 letter. As in 1998 and 1999, LensCrafters' termination of the existing sublease agreement had superceding and final effect over the parties' existing contractual relationship. The only issue that remained in 1998, 1999, and 2001 was whether the

33

parties would enter into a new contractual "relationship" and whether Kehoe would sign a new sublease with LensCrafters to continue his relationship with them. Renewal of the existing sublease agreement was not an option available to Kehoe in 1998 or 1999, and the facts were indistinguishably identical in May 2001. The majority agrees that the only substantive difference between what occurred in 1998-99 and 2001 was that Kehoe decided not to sign a new sublease agreement in 2001. Despite the undisputed certainty of LensCrafters' termination of the parties' previous existing subleases in 1998 and 1999, the majority has now determined that Kehoe could have renewed his existing lease agreement in 2001, after receiving the May 2001 letter. This determination can only be based upon one legal premise—that LensCrafters factually established through the parties' course of dealings that it had the contractual right to both (1) extend an "offer to renew" the existing sublease agreement, and (2) contemporaneously exercise its priority right to terminate the same sublease agreement. Such a determination regarding LensCrafters' rights is illogical, is not legally supportable, and cannot be supported by the course of dealings between the parties in 1998, 1999, and 2000.

LensCrafters argued and the majority has accepted the assertion that the May 2001 letter was either an offer to renew *or* terminate the existing sublease agreement, no different than in 1998 and 1999. This assertion is incompatible with Section 2C

of the sublease agreement and the actual language used by LensCrafters in the 1998, 1999, and 2001 letters to Kehoe. Section 2C provides LensCrafters with only one absolute and superceding right, the right to terminate the sublease agreement at the end of the term. It does not provide LensCrafters with any right to renew the agreement, and this right of renewal was granted exclusively to Kehoe. In the 1998, 1999, and 2001 letters to Kehoe, LensCrafters never offered a renewal of the *"existing"* sublease to Kehoe. Each letter clearly and unambiguously notified Kehoe of the non-renewal and termination of the three previously existing sublease agreements and only offered a possible renewal and continuation of the *"relationship"* with LensCrafters under a completely *"new"* sublease for a new rental term. LensCrafters has provided no authority for the proposition that an offer to continue a relationship under a new contract can simultaneously be construed as an offer to renew a previously existing contract. Where a party cites no authority to support an argument, we may assume no such authority exists. *In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984).

The written notice of non-renewal and termination of the existing sublease agreements only emphasizes the contractual reality that Kehoe's existing sublease agreements were formally terminated by the 1998, 1999, and 2001 letters. Otherwise, Kehoe would have retained his right to renew his existing sublease agreement, even

after LensCrafters delivered the 1998 and 1999 letters. This is not the continuing relationship that LensCrafters has identified or agreed to recognize regarding the parties' sublease relationship in 1998 and 1999. Otherwise, new leases were unnecessary, and the parties' relationship would have simply continued under the previous sublease agreements. In 1998 and 1999, Kehoe was only permitted to continue his relationship with LensCrafters by signing a new sublease agreement, said new documents being specifically included in the very same 1998 and 1999 letters notifying Kehoe of the termination of his previous subleases. It is undisputed that their relationship did not continue under the previous sublease agreements in 1998 and 1999. The 2001 circumstances were identical, except that Kehoe chose neither to sign the new sublease nor continue his relationship with LensCrafters. At this point, the parties' continuing relationship was brought to an end. Effective in May 2001, Kehoe's right to renew the 1999 sublease agreement and any extended relationship created thereunder with LensCrafters ended. As a result of LensCrafters' formal termination of the existing 1999 sublease agreement in the May 2001 letter, I would affirm the district court's grant of summary judgment in favor of Kehoe.

_____

**TIMOTHY L. GARCIA, Judge**

36